IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 25, 2019 at Knoxville

## STATE OF TENNESSEE v. DARIUS DESHUN MITCHELL

**Appeal from the Circuit Court for Lauderdale County**
**No. 9775    Joe H. Walker III, Judge**

_____

### No. W2018-01364-CCA-R3-CD

_____

The Defendant, Darius Deshun Mitchell, was convicted by a Lauderdale County Circuit Court jury of two counts of first degree premeditated murder, two counts of first degree felony murder, two counts of especially aggravated robbery, and one count of possession of a firearm by a convicted felon. *See* T.C.A. §§ 39-13-202 (2014) (subsequently amended) (first degree murder), 39-13-403 (2018) (especially aggravated robbery), 39-17-1307(b)(1)(B) (2010) (subsequently amended) (possession of a weapon by a person who has been convicted of a felony drug offense). The trial court merged the first degree murder convictions with respect to each of the two victims into a single judgment of conviction for first degree murder as to each victim and imposed concurrent life sentences, which were to be served concurrently with a federal sentence and consecutively to a sentence for which the Defendant was on parole. The court imposed twenty-five-year sentences for each of the two especially aggravated robbery convictions and ordered that they be served concurrently with each other and to federal sentence and consecutively to the first degree murder sentences and to a sentence for which the Defendant was on parole. The court imposed a six-year sentence for the firearm conviction and ordered that it be served concurrently with a federal sentence and consecutively to the first degree murder sentences and to a sentence for which the Defendant was on parole. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Richard McFall, Covington, Tennessee, for the Appellant, Darius Deshun Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to the September 4, 2011 shooting deaths of Eric Washington and Jonathan Jones. The Defendant was tried jointly with his codefendant, Darius Alston.

At the trial, Hertha Barlow testified that she was driving in Henning on September 4, 2011, when she came upon a car that was stopped, had the driver's door open, and was blocking the road. Because the roadway was impassable due to the location of the stopped car, she called 9-1-1.

Ripley Police Officer Dan Rayner testified that, on September 4, 2011, he was dispatched to Tate Road to investigate a report of a car stopped in the middle of the road. He said he arrived at 4:09 p.m. He saw a beige car with its engine running and both doors open. He said he checked the car's registration and learned it was registered to Ola Jones.

Officer Rayner testified that he saw two black males who had been shot inside the car. He identified photographs of the men in the car, and the photographs were received as exhibits. Officer Rayner said that he recognized Eric Washington, who was in the driver's seat, but that he did not recognize the other man. Officer Rayner said he secured the scene until an investigator arrived.

Officer Rayner testified that the area where the car was found was wooded and secluded and that a cemetery was nearby. He said Midway Market was one to two miles and no more than two minutes away. He said the cemetery was a common meeting area.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Donna Nelson, an expert in serology and DNA, testified that she was the crime scene leader and that she analyzed the evidence collected for DNA evidence. She said she arrived at the scene at 9:13 p.m. on September 4, 2011. She said that when she arrived, "It was pouring down rain," and that canopies were erected to preserve the evidence. She identified photographs of the scene, which were received as exhibits. The photographs depicted the slain victims inside the car and a package of "Homestyle Fried Chicken" on the front seat. She said the crime scene investigators located a shotgun shell on the driver's floorboard and a baseball cap on the passenger's floorboard. The shotgun shell was received as an exhibit. Agent Nelson said that more than half of the bill of the baseball cap was detached and that the hat had a large hole in one side. She said the investigators

-2-

returned to the scene the next day to search in daylight for additional evidence. She said they found gunshot residue tabs on the car the following day.

Agent Nelson testified that the DNA evidence from the inside rear driver's side door indicated a partial profile from a female but that further identification could not be made. She said cigarette butts from the car's ashtray were not tested because the victims were known smokers. She said samples from Victim Washington's pants near the pockets contained insufficient or degrading DNA which could not be developed into a DNA profile. She said that she tested a t-shirt for blood and that the t-shirt had been submitted to the laboratory by TBI Agent Mark Reynolds. She said Agent Reynolds told her to determine whether the t-shirt contained blood, whether the DNA from any blood matched the victim's[1] DNA profile, and if not, to determine if the DNA profile of any blood matched the DNA profile of "Jack."[2] She said she did not know Jack's identity. She said no DNA evidence was found which matched the Defendant's and co-defendant's DNA profiles.

Ola Faye Jones, Victim Jones's mother, testified that she had seen Victim Jones on the morning of September 4, 2011. She said that after he left her house, she went to her boyfriend, Kelvin Lee's, house to launder clothing. She said that an unidentified person came to the door and told her that "he" had received a call in which he had learned that two cars had been found and that her license plate number had been broadcast over a police scanner. She said she went to the scene but was unable to get close to the car because the police had secured the area.

Ms. Jones testified that she knew the Defendant because he had been an associate of her son. She said the Defendant had come to her house on occasion. She said she had been with them behind the Defendant's mother's house, that the Defendant's mother had been argumentative and told them to move off her yard, that the Defendant told Victim Jones he would kill him, and that the Defendant turned and went inside. She said her daughter, Jameka Phillips, "Della," and "Stephanie" were present when the threat was made. Ms. Jones said she told Victim Jones that this did not make sense and that they were "family folks." She said she asked Victim Jones, "[W]hat [is] up with this?" She said Victim Jones did not respond. She did not know when this happened other than that it had been less than a year before Victim Jones was killed. She said she did not report it to the police but encouraged Victim Jones to contact them. She said that she saw the Defendant on occasion after this incident and that they never had cross words. She said she never saw the Defendant and Victim Jones "running around together" after the incident.

---

[1] She did not specify which victim's blood Agent Reynolds wanted her to compare with a sample from the t-shirt.
[2] Other evidence showed that the codefendant was known as "Jack."

Ms. Jones testified that on another occasion, Victim Jones called her and asked her to have someone pick up his car because the Defendant had "pulled a gun on" Victim Jones. She could not identify when this occurred. She acknowledged she had called the Defendant and asked "[W]hat's up?" and that she told him, "[W]e are family folks," referring to the fact that they were related.

Ms. Jones testified that Mr. Lee picked up a white t-shirt from "[w]here Jack was standing" and took it to Agent Reynolds. She said Mr. Lee put the t-shirt in a bag without touching the t-shirt. She said Mr. Lee picked up the t-shirt near the highway the first time he and she went to the scene. She did not recall if this was on the day of the homicides. She later said she did not recall if Mr. Lee or she gave the t-shirt to Agent Reynolds.

Nicole Pettigrew, the mother of three children with Victim Washington, testified that she and Victim Washington had been in a romantic relationship for nine years. She said Victim Jones was her cousin. She identified the codefendant as Victim Washington's cousin and said she had "heard of" but did not know the Defendant.

Ms. Pettigrew testified that on the day of the homicides, Victim Washington had been having his Uncle Richard repair her Chrysler. She said she and Victim Washington planned to go to a family reunion later. She said that while her car was being repaired, he had Victim Jones's car to drive. She said a dice game took place at her house that day. She said the Defendant, the codefendant, and Victim Washington's father were present. She said she asked Victim Washington why the Defendant was present. She said she had "heard things" about the Defendant, did not trust him, and did not want him around her house. She said she was unaccustomed to seeing him at her house. She said that money was involved in the dice games that sometimes took place at the side of her house and that Victim Washington always possessed large sums of cash. She estimated he possessed $6000 to $7000 on the day of the homicides. She was unaware of any plans Victim Washington may have had to purchase a motorcycle.

Ms. Pettigrew testified that the last time she saw Victim Washington, he stated he was going to Auto Zone. She said she cleaned her house and took care of her children until Victim Washington's niece arrived and told her Victim Washington had been in a car wreck. Ms. Pettigrew said she went to the area near the cemetery and stayed for three to four hours but was unable to get close to the scene. She said she went home until Victim Washington's mother came to get her because a TBI agent wanted to speak with her.

-4-

Ms. Pettigrew testified that the codefendant came to her house the next day and that he offered to repair her car and "put minutes on" her cell phone. She said she did not accept the offer.

Ms. Pettigrew testified that the victims were close and had been friends since an early age. She said that Victim Jones began a relationship with Victim Washington's sister and that the victims saw each other frequently after this relationship began.

Ms. Pettigrew testified that she was unaware of any "ill feelings" the codefendant harbored toward the victims. She acknowledged, however, that she was aware the Defendant "was mad about some stuff that went on way back when."

Ms. Pettigrew testified that Victim Washington sold drugs. She said that, to her knowledge, he was not a gang member and did not have any pending drug charges. When asked if Victim Washington had pending murder charges, Ms. Pettigrew responded that he had been in jail for about eleven months but that she did not know the offenses with which he had been charged.

Sammy Haley testified that Victim Washington was his son and that Victim Jones was Victim Washington's cousin. Mr. Haley testified that he knew the Defendant because they both lived in Henning and that the codefendant was Mr. Haley's cousin.

Mr. Haley testified that he saw Victim Washington at Midway Market around 3:30 or 4:00 p.m. on September 4, 2011. Mr. Haley said that his son was with Victim Jones, that they were in Victim Jones's car, and that they were going to purchase a car starter. Mr. Haley identified a photograph of the car in which he saw the victims. Mr. Haley said Victim Washington stated he was considering purchasing a motorcycle from "Lamar and them" in Ripley for $6500. Mr. Haley said that the victims planned to go to Auto Zone and that Victim Washington wanted Mr. Haley to ride the motorcycle later to determine if it was in good working order. Mr. Haley said that Victim Washington showed Mr. Haley money in Victim Washington's hand and that Victim Washington said "if this is not enough" and put his hand on his pocket. Mr. Haley said Victim Jones purchased a "snack sack" from Midway Market. Mr. Haley said that Stacey Balden and Chris Burnett arrived and that Mr. Burnett told Victim Washington "he wanted to holler at him before he left." Mr. Haley said that Victim Washington answered a cell phone call, that Victim Washington told the caller he was at Midway Market, and that Victim Washington said he was not far from the caller.

Mr. Haley testified that he left Midway Market with his sister-in-law and "them" to return to a barbecue, which was less than three to four minutes away. He said he saw the codefendant "standing on the rock road" under a railroad viaduct that was "towards the cemetery road" within 200 yards of Midway Market. Mr. Haley said he had been at

the barbecue thirty to forty-five minutes before he received a telephone call that something had happened to Victim Washington. Mr. Haley said that, based upon his sighting of the codefendant and the location of the barbecue at which the codefendant claimed to have been when the homicides occurred, it was not possible that the codefendant had been at the barbecue at the time of the homicides. Mr. Haley acknowledged that the codefendant might have been at the barbecue at some other time that day. Mr. Haley was positive the person he saw on the rock road was the codefendant.

Mr. Haley testified that when he arrived at the scene, "a lot of people" were standing around. Mr. Haley said he was not with Josephine Haley, whom he said was at home. He said Josie and Veronica Washington were together and that Ms. Washington was the codefendant's girlfriend. He said Ms. Washington kept asking Josie "to bring the truck to take her to Henning."

Mr. Haley testified that he did not know about any animosity between the codefendant and Victim Washington. He said he would have known if any existed. Mr. Haley said he knew Victim Washington "was hustling" and that dice games took place daily at Victim Washington's house. Mr. Hayley said he saw the Defendant "afterwards" when the Defendant came to Mr. Haley's sister-in-law's house to see "Little Wayne," Mr. Haley's nephew. Mr. Haley said the Defendant gave Mr. Haley $10 and told him to buy himself a beer.

Josephine Haley, Victim Washington's mother and Victim Jones's cousin, testified that she knew the Defendant from living in Henning and the codefendant because he was Victim Washington's cousin. She said that on the day of the homicides, she attended a Labor Day family gathering at her sister Betty's house. She said that she spoke by phone with Victim Washington twice, that he was looking forward to attending the gathering because his aunt was making spaghetti, and that he never arrived.

Ms. Haley testified that Veronica Washington asked her repeatedly to take her to get cigarettes for the codefendant. Ms. Haley identified Ms. Washington as the mother of the codefendant's infant boy. Ms. Haley said she passed the cemetery on the way to the store for the cigarettes but did not know Victim Washington was already dead. She said they saw an ambulance traveling toward the cemetery. She said she called her son repeatedly but did not receive an answer. She said Ms. Washington and the codefendant spoke outside and looked toward Ms. Haley and that Ms. Haley wondered "what's going on." She said they went to "Michelle's" house after purchasing cigarettes. She said that she called "Big Memphis" and Michelle's boyfriend and that they told her the victims had been in a wreck in which one of them had been killed. She later said her son Travis gave her this information. She said she looked outside and saw the codefendant cooking on a grill.

-6-

Ms. Haley testified that she went to the scene, where she screamed and cried. She said that the codefendant approached and hugged her, that he said "Goon" killed Victim Washington, and that the codefendant said he would have killed Goon if he had a gun. She identified Goon as her cousin. She said Big Memphis and "L. Barber" "came and got" the codefendant after the codefendant finished hugging her. She said the codefendant removed his shirt and threw it in the grass. She said that Big Memphis placed the codefendant in a car and that they left. She said Victim Washington would have been dead by the time she saw the codefendant at the family gathering. She said that Ms. Washington had been insistent about getting cigarettes, and that it was "like [the codefendant] was rushing [Ms. Washington] to get me there for an alibi." Ms. Haley said the codefendant had been at the family gathering after the homicides had occurred. She said that the codefendant had worn a bulletproof vest at her sister's house but that no one treated him differently because he was family and because no one knew what had happened. She said she had seen the Defendant and the codefendant together frequently and thought they were "best friends . . . or cousins."

Ms. Haley testified that she went to her sister Betty's house around 8:00 a.m. on September 4, 2011. She said Veronica Washington arrived around 10:00 to 10:30 a.m. but not later than 11:00 a.m. She said that the codefendant was not with Ms. Washington when Ms. Washington arrived and that she did not see him at the family gathering until after Victim Washington was dead.

James Russell Davis, a retired TBI special agent forensic scientist, testified as an expert in microanalysis. He said he analyzed samples collected from the car in which the victims were found for gunshot residue. He said gunshot primer particles were present on the driver's headrest, which indicated the headrest had been near a gun when it was fired or that it came into contact with a recently fired gun or recently fired ammunition components. He said he did not analyze additional samples because of the positive findings relative to the headrest.

TBI Agent Mark Reynolds testified that he responded to the scene at Bethlehem Cemetery Road on September 4, 2011. He saw a car parked in the center of the road with both doors open and two deceased individuals inside. He said he contacted the violent crime response team, which collected evidence. He said they collected Victim Washington's pants because the pockets had been pulled out as if someone had gone through them. Agent Reynolds said DNA analysis of the pants pockets was unsuccessful in identifying a DNA profile. He acknowledged that no physical evidence from the scene implicated the Defendant and the codefendant.

Agent Reynolds testified that he received a t-shirt from a woman whose identity he did not recall. He said that the woman stated she had seen the codefendant remove the

-7-

t-shirt and throw it in a ditch and that she had retrieved it. Agent Reynolds noted a reddish brown stain on the t-shirt. He said the woman gave him the shirt about two days after the homicides occurred.

Agent Reynolds testified that he arrived at the scene around 4:00 or 4:30 p.m. and that the violent crime response team arrived three or four hours later. He said that the weather was "pretty rough" and stormy and that they used tarps to protect the car and preserve evidence.

Agent Reynolds testified that he obtained video recordings from security cameras at Midway Market. Referring to screenshots from the recordings, he identified the victims and Sammy Haley, Victim Washington's father, at the market. Agent Reynolds said Victim Jones could be seen in the recording with a bag of chicken. Agent Reynolds said the uneaten chicken was at the scene in the front seat of the car. Agent Reynolds said the date and time stamp on one of the screenshots read "9/4/2011, 15:38:33." He did not know if the time had been calibrated to account for Daylight Savings Time.

Agent Reynolds testified that the case was "unsolved" for several years. He said that eventually, a person in federal custody provided information which led to the indictment of the codefendant. Agent Reynolds said that he also received information implicating the Defendant and that a superseding indictment was obtained which also charged the Defendant.

Agent Reynolds testified that he interviewed the codefendant in September 2011 at the codefendant's aunt's house. Agent Reynolds said the codefendant claimed he had been at a family gathering at his aunt's house on the day of the homicides. Agent Reynolds said that the codefendant's voice cracked and that he appeared nervous. Agent Reynolds said that the codefendant's girlfriend was present and that "she had a look on her face that she knew different of what he was telling us." Agent Reynolds agreed he had not met the codefendant or the codefendant's girlfriend previously.

Agent Reynolds testified that he interviewed Sammy Haley, whose statement contradicted the codefendant's statement about the codefendant's whereabouts on the day of the homicides. Agent Reynolds said the video evidence from Midway Market corroborated Mr. Haley's account of the time and location of relevant events.

Agent Reynolds testified that he interviewed the Defendant in April 2014 about this and other cases. Agent Reynolds said the Defendant did not provide any information relative to the Defendant's involvement in the present case.

Terence Scales testified that he was serving a Tennessee sentence for facilitation of first degree murder and that he previously had been in federal custody with the

Defendant for three to four months. Mr. Scales thought this had been around the end of 2014. He said he had not known the Defendant previously. Mr. Scales said he had also been incarcerated with the codefendant for about one month. He said he had daily contact with the Defendant and the codefendant when they were incarcerated together. Mr. Scales said that he had not known Victim Jones but that he had known Victim Washington through their mutual acquaintance, Tasha Morris.

Mr. Scales testified that he and the Defendant had several conversations about the homicides. Mr. Scales stated that the Defendant said "they" had called the victims to buy drugs but that "they ended up killing the victims" and "took what they wanted to take." Mr. Scales said the Defendant stated this occurred near a cemetery in Henning. Mr. Scales stated that the Defendant recounted having "set the victims up." Mr. Scales said the Defendant stated he "left them slump [sic] in the car." Mr. Scales described the Defendant as bragging and lacking remorse in their conversations about the homicides.

Mr. Scales testified that the codefendant was present on one occasion for a conversation Mr. Scales and the Defendant had about the homicides. Mr. Scales said the Defendant expressed that he had been disgruntled with Victim Jones for switching gang affiliation. Mr. Scales said he thought Victim Washington "used to talk [to] a female" who the Defendant had "talked to once before." Mr. Scales did not think the codefendant had been present when the Defendant had stated the Defendant left the victims slumped in the seats. Mr. Scales said he believed what the Defendant and the codefendant told him because they had no reason to fabricate the information. He agreed, however, that inmates had an incentive to fabricate involvement in criminal activity in order to intimidate other inmates.

Mr. Scales acknowledged that he never attempted to speak with anyone employed by the correctional institution about the conversations he had with the Defendant and the codefendant. He said that he wrote a letter to the district attorney about the information in early 2015. He later identified the letter, which was dated October 29, 2014, and agreed he had written follow-up letters in 2015. He said he did not ask for anything in exchange for providing the information. He acknowledged that other inmates had admitted criminal activity to him but that he had not provided the authorities with information about those conversations. He said no one else had admitted criminal activity "of this magnitude." He said he had not given a statement to the authorities about this case. He later acknowledged that he had given a statement to Agent Reynolds "because of that letter," had provided information about other cases, and might have said something about this case. He clarified that he had talked to law enforcement about the Defendant's involvement in this and other cases but not about other individuals' criminal activity.

Mr. Scales testified that his sentence would expire in July or August 2018 and that he had a detainer for a federal firearms offense. He acknowledged that he had a pending sentencing matter at the time he provided information relative to this case.

Mr. Scales acknowledged that he had lied to law enforcement at times. He said he was a criminal and had not been "the most honest, law-abiding citizen."

Terrance Yarbrough, a federal inmate for a human trafficking offense, testified that he previously had been incarcerated with the codefendant for about six months to one year. Mr. Yarbrough said he had not known the victims. Mr. Yarbrough said that the codefendant and he were close friends who spoke daily when they were incarcerated together.

Mr. Yarbrough testified that the codefendant had confided in Mr. Yarbrough after the codefendant's mother died. Mr. Yarbrough said the codefendant stated he felt like "karma had [come] back on him" because of "what he had done." Mr. Yarbrough said the codefendant stated that the codefendant and "Murder" had "set his cousin up." Mr. Yarbrough said the codefendant identified Victim Washington, who was also known as "E-Dubb," as the codefendant's cousin who had been set up.

Mr. Yarbrough testified that the codefendant stated he rode to the cemetery in the backseat of an "old school Buick" with the victims, who were going to the cemetery for a Vice Lords meeting. Mr. Yarbrough said the codefendant stated he had been worried about one of the victims' fathers having seen the codefendant get into the Buick. Mr. Yarbrough said the codefendant had just been released from jail and wanted the victims to give him some drugs to sell. Mr. Yarbrough said the codefendant stated that "they" had robbed the victims and that the codefendant killed Victim Jones. Mr. Yarbrough did not recall the amount of money the codefendant claimed to have obtained from the robbery, but he thought it was less than $10,000. Mr. Yarbrough said the codefendant talked to him once or twice about the facts of the case.

Mr. Yarbrough testified that he had spoken to the Defendant when they were incarcerated together "but not about the case directly." Mr. Yarbrough said he overheard the Defendant at the microwave telling another inmate that the Defendant "did E-Dubb." Mr. Yarbrough said he came forward with information about this case because he did not agree with the codefendant's killing a member of the codefendant's family. Mr. Yarbrough said he received the information about this case around February 2013 but then said it could have been anytime between late 2012 and April or May 2013. He agreed he had not come forward until several months to a year later. He later said he had written a letter to the district attorney in May 2017, but he also said he wrote two letters. He said he was not seeking assistance and had no pending sentencing matters when he wrote the 2017 letter. He said he had not provided information about anyone other than

the Defendant and the codefendant. When asked if the Tennessee Department of Correction or the United States Bureau of Prisons had identified him as being associated with a gang, he said, "They try to connect me to the Vice Lords." He denied he had ever been a member of the Vice Lords.

Marco Ross, M.D., an expert in pathology, testified that the Western Regional Forensic Center performed an autopsy of Victim Jones. Dr. Ross stated that Victim Jones's cause of death was a gunshot wound to the head and that the manner of death was homicide. Dr. Ross said Victim Jones had four shotgun wounds: two to the head, one to the left shoulder, and one to the left upper arm. Dr. Ross said the wounds resulted from shots fired at a distance of three to four feet. Dr. Ross said that the trajectory of the shotgun wound to the left back of the head was left to right and that death would have resulted instantaneously to seconds to minutes later. Dr. Ross said the other wounds were consistent with a back-to-front direction of fire. Dr. Ross said that toxicology analysis of samples collected from Victim Jones revealed the presence of marijuana and hydrocodone. Dr. Ross said shotgun pellets and wadding were collected from Victim Jones's body.

Dr. Ross testified that Victim Jones's injuries were consistent with those a person seated in the right front passenger seat of a car might receive if the shooter were directly behind or slightly to the left and behind the person. He agreed it was unlikely that wounds of this nature could be inflicted from outside the car if the victim were seated in the right front passenger seat of a car. He agreed he did not have any information about Victim Jones's body position at the scene.

Dr. Ross testified that his office also performed an autopsy of Victim Washington. Dr. Ross said that Victim Washington sustained two close-range wounds from shots fired at a distance of three to four feet, which were the cause of death, and that the manner of death was homicide. Dr. Ross said the trajectory of the wounds began at the slight back left side, traveling toward the right front. He said death would have occurred instantaneously to within a few minutes. He said Victim Washington's toxicology analysis revealed the presence of marijuana. Dr. Ross said shotgun pellets and wadding were collected from Victim Washington's body.

Dr. Ross testified that Victim Washington's wounds were inconsistent with those a person seated in the driver's seat might receive if the shooter were seated in the rear left passenger seat, unless the person in the driver's seat were turned in such a way as to have received the wounds. Dr. Ross agreed a victim seated in the driver's seat could have sustained wounds like Victim Washington's from a shooter outside the car if the driver's window were rolled down.

-11-

Dr. Ross testified that the shotgun pellets he collected from the victims appeared to be birdshot, rather than buckshot. He could not say whether all of the shots were fired from a single weapon and could not identify the gauge of the weapon or weapons involved. He said no evidence indicated that the victims' wounds resulted from shots fired from a pistol.

Mardrakous Sugars testified that he was currently a federal inmate for a conspiracy to commit a sex trafficking offense and that he and the Defendant had been cellmates in a state facility for about two weeks. Mr. Sugars said he had not known the victims.

Mr. Sugars testified that the Defendant told him that the Defendant had lured the victims to a cemetery where the Vice Lords were meeting. Mr. Sugars said the Defendant stated that the Defendant intended to rob the victims but that "the robbery went bad." Mr. Sugars said the Defendant stated that the Defendant shot Victim Jones. Mr. Sugars said the codefendant had animosity toward the victims because the victims "wouldn't give him his piece of the pie." Mr. Sugars described the Defendant as "bitter-hearted" and "hateful" and said the codefendant did not like to see a person doing better than the Defendant did. Mr. Sugars said the Defendant stated that if he saw someone doing better than himself, he would "try to take what they got." Mr. Sugars thought the Defendant talked about the crimes in order to try to "fit in" and said the Defendant did not express remorse.

Mr. Sugars testified that he and the Defendant had the conversation about the offenses in late 2013 or early 2014. Mr. Sugars said that eight months to a year later, he talked to his attorney for his federal charges about the Defendant's admission. Mr. Sugars agreed he talked to his attorney before his November 2014 sentencing in federal court but denied he received any sentencing benefit in exchange for providing information to the authorities about the Defendant. Mr. Sugars acknowledged that he was a member of the Crips. When asked if he was familiar with "prison code," whereby an inmate did not inform about another inmate, he said he was an "outlaw" and did not agree with following laws or the prison code. He said he was loyal to the Crips but was an outlaw as to other inmates. He agreed that the crimes in the present case were the only ones of which he had learned in prison about which he had provided information to the authorities.

Marwan Meux testified that he and the Defendant had been cellmates for one and one-half months and that they worked together in the prison kitchen. Mr. Meux said he had not known the victims. Mr. Meux acknowledged that he was serving a federal firearms sentence.

Mr. Meux testified that the Defendant had told Mr. Meux that the Defendant had been supposed to meet the victims "in a cemetery or something," had "hopped out," and had "shot dude." Mr. Meux said that "they" were Vice Lords gang members and "[t]hat's how they trick them there." Mr. Meux explained that the Defendant had stated that the Defendant rode with his "partner" to the cemetery and that they got out of the car and started shooting with a "pump." Mr. Meux said the Defendant "had beef with Juice[3] about a girlfriend back in the day" and had wanted to shoot Juice. Mr. Meux said the Defendant stated he had shot Juice. Mr. Meux said the Defendant had been jealous that Juice had been doing better financially than the Defendant. Mr. Meux said he and the Defendant spoke about the incident a couple of times. Mr. Meux said he had come forward in order to bring closure to the victims' families.

Mr. Meux testified that the Defendant made the statements to him between approximately November 2013 and January 2014. Mr. Meux said that most inmates at the facility where he had been incarcerated with the Defendant did not talk openly about their conviction offenses but that the codefendant bragged about the present offenses, even though he had not been charged with them at the time. Mr. Meux said he had contacted the prosecutor about the Defendant's admissions two to three months before the present trial, which took place in February 2018. Mr. Meux said he had last been sentenced in July 2014 and had eight years left to serve at the time of his testimony.

The codefendant elected not to offer evidence.

The Defendant testified that on September 4, 2011, he had been at his home but acknowledged he had not been home continuously that day. He said he had spent the previous night at his cousin, Tiffany Hurdle's, house. He said he had returned home that morning and had been "riding around and stuff like that" earlier in the day. He said many out-of-town family members had come to town for the Labor Day weekend and were at his house. The Defendant stated that everyone in Henning had a police scanner and that when a notification was broadcast about a "wreck or something" involving a car registered to Ola Faye Jones, he had been standing outside his mother's house. He said he had been playing with his son, Keshun, and had been with Jeremy Hurdle and Adrian Osborne.

When asked if he had been at the cemetery on the date of the offenses, the Defendant said he went to the scene after the crime scene tape had been erected and others had arrived. He said he could see the car but did not see the victims' bodies. He said people at the scene identified the victims and said they had been killed. He denied

---

[3] Other evidence showed that Victim Jones was known as Juice.

that he "rode through the lane," hung out the window, yelled that the victims were "dead in the cemetery," and warned Andreas Smith to "get out there."

The Defendant testified that the inmate witnesses testified untruthfully about his alleged inculpatory statements relative to the crimes. He denied any involvement in the victims' deaths.

When asked if he was known by the nickname "Murder," the Defendant said his nickname was Deshun. He acknowledged that he had two felony theft convictions.

The Defendant testified that the victims never did anything to him and that he never did anything to them. He said he had lived around the victims all of his life. He denied he had been mad at the victims over their failure to share profits from their drug business. The Defendant stated he had never robbed anyone. When asked if he had robbed and shot Reginald Alexander, he said he had pled no contest and had not admitted guilt.

The Defendant testified that he had not made threats against Victim Jones. He denied arguing with Victim Jones at the Defendant's mother's house in the presence of Ola Faye Jones and said he and Victim Jones never had words of that nature. He denied that he had a grudge against Victim Jones about "the whole car deal with Jeremy Hurdle's car on the lane when he had the wreck." The Defendant said he received a letter from Victim Jones when Victim Jones was in jail, in which Victim Jones stated he had nothing to do with the codefendant's brother's car being "shot up." The Defendant denied that he had vandalized Victim Jones's car and denied knowing about Victim Jones's car being vandalized. The Defendant denied that he had told Patricia Bolstic that her son, Ryan, should not associate with Victim Jones because the Defendant was going to kill Victim Jones. The Defendant denied that he told anyone he was going to kill the victims and that he was mad because the victim took over the drug business in Henning without compensating him.

The Defendant acknowledged that he made a proffer to TBI Agent Reynolds at the United States Attorney's office, in which he said the codefendant had admitted in front of several people that the codefendant killed the victims. The Defendant said the prosecutor sent Agent Reynolds to offer him "time served to lie on" the codefendant. The Defendant denied he had said that the victims were left in the cemetery and that a twelve-gauge, sawed-off shotgun had been used. The Defendant denied he had ever been a Vice Lord. He said he had not been cellmates with Mr. Meux and did not recall having been cellmates with Mr. Sugars.

Ola Faye Jones testified on rebuttal that the Defendant's nickname was "Murder." She reiterated her previous testimony about the Defendant's threatening Victim Jones in

her presence outside the Defendant's house. She said that on another occasion, Victim Jones called and asked her to pick up his car. She said Victim Jones stated the Defendant had "pulled a gun on him" at Midway Market. She said she encouraged Victim Jones to notify the police. Ms. Jones said the vandalized car had belonged to Victim Jones's girlfriend, Sharday, not to Victim Jones. Regarding an incident with Jeremy Hurdle's car, Ms. Jones said that there was "bad blood behind it" and that unidentified individuals tried to blame Victim Jones. She agreed that around the time of the incident with Mr. Hurdle's car, she came home and found bullet holes and debris from bullets and pellets in her house. Ms. Jones said Victim Jones and the Defendant were Vice Lords.

Sammy Haley testified that he knew the Defendant and that the Defendant's nickname was "Murder." Mr. Haley reiterated his previous testimony that on the date of the homicides, he had seen the victims at Midway Market and that he left before they did. Mr. Haley said that as he left the market, he saw the codefendant near a tunnel walking near a rock road. Mr. Haley said that when they passed a bridge, a black Explorer SUV and a blue Chevrolet Corsica almost hit the car in which he was riding. He said that several people were in the Explorer and that they included Jeremy Hurdle and one of the "Thelma twins." He said "Bob," who had since died, was in the Corsica, along with other unidentified individuals. He said that the vehicles were headed in the direction of the cemetery but that he did not see where they went.

TBI Agent Mark Reynolds testified that in a proffer at the United States Attorney's Office on April 25, 2014, the Defendant stated that the codefendant had killed the victims. Agent Reynolds said the Defendant named several individuals to whom the codefendant admitted he had killed the victims. Agent Reynolds said the Defendant stated he heard the codefendant talking about shooting the victims' faces off with a twelve-gauge, sawed-off shotgun and leaving the victims at the cemetery. Agent Reynolds said the Defendant stated he had heard the scene was gruesome. Agent Reynolds explained that a proffer in the federal system involved a defendant providing information in exchange for possible leniency in sentencing.

Agent Reynolds testified that when the authorities arrived at the scene, they blocked the road in a location such that no one would have been able to see the scene. He said that if anyone testified that he or she saw the crime scene, the person would have had to have been there before the authorities arrived. He said a twelve-gauge shotgun shell was recovered at the scene. He said that TBI investigative files were confidential and that the Defendant provided information that was not publicly known.

Terrance Yarbrough testified that when he overheard the codefendant talking at the microwave, the codefendant stated, "[Y]ou know I killed that boy. You know, I did E-Dubb."

Mardrakous Sugars testified that the Defendant had told him that he and the codefendant were supposed to rob the victims and that the Defendant and the codefendant told the victims to meet them in the cemetery where the Vice Lords meet. Mr. Sugars said the codefendant stated the robbery "end[ed] up going bad." Mr. Sugars said the Defendant did not say who had killed whom. Mr. Sugars stated that the Defendant said the homicides occurred because the codefendant was not getting his "piece of the pie." Mr. Sugars said the Defendant told him that his nickname was "Murder" and that he was a Vice Lord.

Marwan Meux testified that the Defendant told him that the Defendant shot "Juice," whom the codefendant did not like due to "an old beef about a girlfriend, and tricked the codefendant into killing the codefendant's cousin due to jealousy and envy. Mr. Meux said that he knew the Defendant by the nickname "Murder" and that the Defendant was a Vice Lord with a Playboy bunny tattoo on his neck.

Agent Reynolds was recalled and identified a document reflecting that the Defendant and Mr. Meux had been housed in the same cell.

After receiving the proof, the jury found the Defendant guilty of one count of first degree premeditated murder for each of the two victims, one count of first degree felony murder in the perpetration or attempted perpetration of robbery for each of the two victims, and one count of especially aggravated robbery for each of the two victims. After the State offered certified copies of the Defendant's prior felony convictions for two counts of theft of property valued at $1,000 or more but less than $10,000 and one count of delivery of a schedule II narcotic weighing more than 0.5 gram, the trial court submitted a count involving firearm possession to the jury. The court also submitted the issue of the appropriate sentence for the first degree murder convictions. The jury found the Defendant guilty of the unlawful possession of a weapon offense. The jury found that the Defendant should be sentenced to imprisonment for life for the homicide convictions, and the trial court imposed life sentences. After the court sentenced the Defendant for his remaining convictions,[4] this appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view

---

[4] The record does not contain a transcript of the sentencing hearing or other information about the codefendant's sentencing.

of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Defendant argues that the evidence is insufficient because (1) the State did not offer physical evidence which linked the Defendant to the crimes, (2) no eyewitnesses testified that they saw the crimes occur, (3) the Defendant did not confess, and (4) the State's evidence consisted largely of "jailhouse snitch testimony" of questionable credibility. The Defendant does not identify any elements of the individual offenses which he contends the State failed to prove, and he makes no arguments nor cites relevant authorities specific to his challenge to each of the conviction offenses. *See* T.R.A.P. 27(a)(7)(A) (stating that an appellant's brief shall contain the reasons why the appellant's contentions require relief, with citations to authorities).

## First Degree Premeditated Murder

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2018), 39-13-202(a)(1) (Supp. 2011) (subsequently amended). In the context of first degree murder, intent is shown if the codefendant has the conscious objective or desire to cause the victim's death. T.C.A. § 39-11-302(a) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"); *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

-17-

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).

## A. **Victim Jones**

The Defendant was convicted of one count of first degree premeditated murder for each victim. Viewed in the light most favorable to the State, the evidence shows that the Defendant and his codefendant planned to rob the victims and that they lured the victims to the cemetery under the pretext of purchasing drugs. Once there, the Defendant and the codefendant executed their robbery plan, but it "went bad," and the victims were shot with a twelve-gauge shotgun. Relative to Victim Jones, the evidence shows that the Defendant threatened to kill Victim Jones and, on another occasion before the crimes, pulled a gun on Victim Jones. Mr. Sugars and Mr. Meux testified that the Defendant made jailhouse admissions and bragged about the crimes, including statements that he shot Victim Jones and that he stole from the victims because they were doing better than he was. The Defendant provided information in a federal proffer which included details about the crimes that had not been released to the public, including the caliber of the weapon used and the gruesome nature of the homicides. The autopsies revealed that the victims had suffered shotgun wounds, and a twelve-caliber shell was found at the scene. Mr. Meux testified that the Defendant stated the victims were shot with a "pump."

The jury had the opportunity to evaluate the testimony of the witnesses, including the jailhouse informants and the Defendant. The jury's verdict reflects that it credited the testimony of the informants and discredited that of the Defendant, as was its province as the trier of fact. The evidence is sufficient to support the Defendant's conviction of the first degree premeditated murder of Victim Jones.

## B. **Victim Washington**

The evidence shows that the codefendant was the person who killed Victim Washington, but the Defendant could nevertheless be found guilty of the first degree premeditated murder of Victim Washington under a theory of criminal responsibility.

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *State v. Dorantes*, 331 S.W.3d 370, 386 (2011) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). As relevant here,

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

Viewed in the light most favorable to the State, the record reflects that the Defendant and the codefendant planned and executed the crimes jointly and with a common intent. Additionally, the evidence shows that the Defendant told Mr. Meux that he "tricked" the codefendant into killing Victim Washington. The evidence is sufficient to support the Defendant's conviction of the first degree premeditated murder of Victim Washington.

## First Degree Felony Murder

The Defendant was also convicted of two counts of felony murder committed in the perpetration or attempted perpetration of robbery, an alternative theory of criminal liability for first degree murder. *See Carter v. State*, 958 S.W.2d 620, 624-25 (Tenn. 1997); T.C.A. § 39-13-202(a)(2), (b).

First degree felony murder is, in relevant part, the "killing of another committed in the perpetration of or attempt to perpetrate . . . robbery[.]" *Id.* § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit the enumerated offenses or acts[.]" *Id.* § 39-13-202(b). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401 (2018).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id*. § 39-11-302(b).

Viewed in the light most favorable to the State, the evidence shows that the Defendant, along with the codefendant, planned and executed a robbery or attempted robbery of the victims while armed with a shotgun. The victims both suffered fatal shotgun wounds during the robbery. The evidence is sufficient to support the Defendant's convictions of first degree felony murder of each of the two victims.

### Especially Aggravated Robbery

The Defendant was convicted of two counts of especially aggravated robbery, one for each victim. As relevant here, especially aggravated robbery is a robbery accomplished with a deadly weapon and in which the victim suffers serious bodily injury. *Id.* § 39-13-403 (2018). A deadly weapon includes "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury[.]" *Id.* § 39-11-106(a)(5) (Supp. 2011) (subsequently amended). Serious bodily injury includes bodily injury that involves a substantial risk of death. *Id.* § 39-11-106(a)(34)(A).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and the codefendant planned and executed a robbery of the victims. Victim Washington's pants pockets were pulled out, as if someone had gone through them. Ms. Pettigrew and Mr. Haley testified that Victim Washington possessed a large amount of cash earlier in the day. The Defendant bragged about the crimes afterward and stated he took what the victims had because they were doing better than he was. The victims were shot with a twelve-gauge shotgun during the robbery, and they died from their injuries. The evidence is sufficient to support the Defendant's convictions for especially aggravated robbery.

### Possession of a Firearm by a Person Who Has Been Convicted of a Felony Drug Offense

The Defendant was convicted of possession of a firearm by a person who has been convicted of a felony drug offense. "A person commits an offense who possesses a firearm . . . and . . . [h]as been convicted of a felony drug offense." *Id*. § 39-17-1307(b)(1)(B) (2010) (subsequently amended).

Viewed in the light most favorable to the State, the evidence shows that the Defendant possessed a firearm during the robberies and homicides and that he had a prior felony conviction of a drug offense. The evidence is sufficient to support his conviction.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE